Mr. Case, good morning again. Yes, Your Honor, and again, if I could reserve one minute? You may. Thank you. Like the appeal we just heard, this case also involves a seminal decision, a decision adopted in part, or at least applied in part, by the bank, which I think is dispositive of the appeal. Well, on that point, was the issue of distribution rights rights before either the bankruptcy court or the bank? The exclusivity of the distribution rights, Your Honor, and their protection under 365N, that was the central argument below. That was argued extensively before the bankruptcy court at the oral argument and also extensively before the bank. Let me follow up on Judge Turay's question. Let's assume 365N doesn't apply, has nothing to do with this. Then the question is, sort of at common bankruptcy law, what rights are left? You would say you still have some form of trademark rights. You say you have some form of damages. And one question is whether you're just an unsecured creditor with damages or whether you have some post-petition administrative type claims. What, let's assume the amendment does not apply, what do you say you're entitled to and did you raise that argument before either of these courts? Because it kind of looked to me like you did not get any determination from either the bankruptcy court or the BAP as to sort of what happens once we decide the Sunbeam and amendment issues. Yeah, actually we argued Sunbeam before the bankruptcy court and before the BAP. That may be, but suppose you're wrong. Did you actually get any rulings from those courts about what you have left? Sure, the BAP actually found that we had trademark rights that were unfettered through the wind-down period because under Sunbeam our rights under the trademarks were unaffected by rejection. Suppose they're wrong. Well, I mean, if Sunbeam doesn't apply and 365N does not apply, then essentially the court would be arguing for Lubrizol to apply. And not necessarily. Well, I mean, I think those are mutually exclusive positions. Lubrizol I think has been rejected by virtually everyone but that court. Well, you could say 365N is a field addressing provision. And so Sunbeam's gone, Lubrizol's gone, everything's driven by 365N, you're either in or out. And I guess the question is if you're out and you're out on that theory, is there any other argument that's being pressed? Well, I mean, let's sort of, I guess, let's start with the sort of building blocks of the case first. No, actually, I don't want you to do that. I want you to answer the question. Yeah, I'm about to. Which all three of us have now asked. Sure. There is no question that our non-exclusive rights were unaffected by rejection. Everybody agrees that that was true. That includes our non-exclusive rights to use the trademarks and trade names during wind-down. Those rights, everybody conceded, were unaffected by the rejection of the case. The appellees are not arguing otherwise. So that even if 365N did not apply, which even the Bankruptcy Court found that it applied to a degree, just not to the exclusivity provision, and which the BAP found didn't need to apply to trademarks because of Sunbeam, but even if the exclusivity provision we have is not protected by 365N, which we think it is under a plain meaning reading of 365N, even if that's not true, and even if it's not an exclusive license, which it clearly is because it fits the classic definition of an exclusive license, even if you stripped away all of our arguments, we would still have damages arising out of the fact that they interfered with our use of the trademarks during the wind-down period. Those would be pre-petition damages. Those would be pre-petition damages if the exclusivity right did not extend, but they might be post-petition damages, Your Honor, to the extent that they interfered with our ability to get contracts post-petition. Neither of us has gotten there because we stayed discovery pending all of these proceedings. But no one is arguing that you wouldn't have at least pre-petition damages. In fact, I think that's the argument the other side is making. That's all you have. Yeah, I mean, I don't want to put words in your mouth. I think they want to also argue that they think we won't be able to prove those pre-petition damages, but there's no question a contract was rejected and rejection damages arise out of that rejection. Well, the question of whether you can or cannot prove isn't really a question for us. Correct. I think that's right, Your Honor. But that's, to go back to Judge Torea's question, that's an issue that has not yet been resolved by the courts below. That's correct, and I think we would all agree that whatever happens before this court is simply going to determine the scope and parameters of the claims, objections, litigation below. That claims, objections, litigation will either be about the amount of our unsecured rejection claim or, if the decision here is favorable to us, will be about the size of our administrative claim, if any, based on the number and extent and damages arising from post-petition breaches of our exclusivity rights. A plain language argument, as I understand it, relies on 365N1B that you get to retain your rights, including the right to enforce any exclusivity provision of such contract. And so you want us to read that parenthetical, including the right to enforce any exclusivity provision of a contract, as applying to an exclusivity provision, even if the exclusivity provision itself, we were to find, isn't an intellectual property right or isn't even a subset of intellectual property rights. Even if it isn't some form of stand-alone license. And I see how you get that if you stopped reading where I read. But as I read it, it's referring to your rights to such intellectual property. And then any exclusivity provision seems to be a subset of that, not an add-on to it. How do you respond to that? Yeah, I actually think it starts at a broader point and doesn't narrow to the point where you want to get to or where the bankruptcy court got. Importantly, this provision applies to executory contracts under which the debtor is a licensor of intellectual property. Congress could have said this applies to licenses. It didn't. It clearly wanted to encompass contracts that contained licenses and contained a bunch of other things. So we start with the concept that it can be a contract with ancillary provisions, where the license essentially provides support for all those other ancillary rights and obligations. It then says that when a debtor rejects such a contract, that the counterparty to the debtor is to enforce its provisions, including exclusivity provisions. It doesn't say including exclusive licenses, which is how the bankruptcy court wanted to read it. It says exclusivity provisions. Well, but it really depends on whether... I mean, it refers to contracts in which the debtor is a licensor to a right to intellectual property. And then it may retain its rights, which would seem to be a reference back to rights to intellectual property. And indeed, it then says to such intellectual property. And it's in that context that we have the parenthetical including, as opposed to not adding on to a right to enforce any exclusivity provision. So it would seem that you would read that as saying, if I've got an exclusive right to use your patent, I not only get to continue to use the patent, notwithstanding your rejection, but I also get to enforce the exclusivity right to use the patent.  Which is if I have a non-exclusive right to use a patent in an exclusive distributorship agreement, I also get to enforce the exclusive distribution rights. That's right, Your Honor, because I think the reference to the rights is back to rights under the contract, not rights to intellectual property. And the other reason that makes sense is that 365N was designed to mimic exactly the results that Sundin later generated. It was to reverse Lou Brizal and say, rejection is just a breach. Oh, we don't know that. Justice Scalia's ghost is in the courtroom. The question of legislative history, legislative intent, all we have is the text. And the text plainly excludes trademarks. And such legislative history as we have suggests that that was quite deliberate, that trademarks are a sort of different type of intellectual property. And Congress really wanted to wait and see what the arguments were on both sides and maybe turn back to the issue. But they haven't turned back to the issue. So all we have is the exclusion. Yeah, no, Congress clearly, on the issue of trademarks, which is just a small subset of the rights we have under the contract, clearly Congress says... So you think, apart from that, the language in the Act gives you the rights you just described? Yes, because I think it applies to any exclusivity provision. If Congress wanted to say any exclusive license, it would have said so. Excuse me. Sure. Sorry, Ron. It does not include in the definition of intellectual property trademarks, does it? It does not. And again, as to trademarks... That should be something that we should take into consideration. Certainly. And I don't disagree with Judge Lynch on that point. Congress said, as to trademarks, they wanted the common law to develop the answer to the question on trademarks. There's every indication of what Congress was concerned about in the trademark arena with the relative rights of franchisors and franchisees, and that they couldn't sort of figure out a way to make that all work by leaving franchisees with all of their rights to use marks but not requiring franchisors to source materials. Can you be at McDonald's if McDonald's is not sort of selling you all the stuff? And so they wanted that to develop under the common law. Sunbeam is an example of that development. Sunbeam says, it doesn't matter, trademarks are swept into this. If you have a trademark right, that's one of the rights that gets preserved when the debtor rejects. Thank you. Thank you, Your Honor. Mr. Harrington, good morning. Good morning, Your Honor. May it please the Court. Lee Harrington for the Eppley Gold Coal LLC. I think that the reading of 365N proposed by Judge Gallo is exactly on point. I read it the same way. I read it to speak only to rights and intellectual property, and to the extent that there is an exclusivity provision that is attached to that right, that right can also be enforced. But it doesn't and cannot be read to say that if you have a contract that grants you a license and somewhere in that contract there's some other non-IP protected exclusivity provision that gets swept up into 365N's post-rejection protections. I also agree that it's quite clear from the statute that 365N protects intellectual property and 10135A excludes trademarks intentionally from the definition of intellectual property. To the extent that the courts are asked to look to the legislative history to try and gather some intent for that exclusion, it's left to the discretion of the courts to make a case-by-case determination at best whether or not they think trademarks should be included in the protections under 365N on a case-by-case basis. Judge Deasy did just that and found that in this instance there was no protection afforded because he clinged faithfully to the statutory... Your case-by-case basis sounds suspiciously like you think there's some equitable discretion here. Are you making that argument? I don't think there is, Your Honor, but to the extent that we're looking at legislative history that says, look, we don't want to make this determination as to trademarks on a statutory basis, we'll let the common law develop it. The judge may have exercised his decision, and the BAP also said that they weren't going to find any equitable reason in this case to afford 365N. Okay, so you agree they're both right on that. But what do you think the common law actually says? I think that by the definition, by the effect of a trademark in the stream of commerce, I think Congress was concerned about the fact that trademarks are, in fact, different than a patent or some other sort of copyright-understood, defined... I didn't ask you about Congress. I asked you about the common law. Because trademarks are unique creatures. They are public-facing. They are the brand on a Coca-Cola bottle. They are the brand on a label of clothing. So I think that they may enjoy different protections, but they don't under Section 365N. Can you use a specific example to focus us in here? General Motors, didn't they go through bankruptcy? They did. So if they had rejected a dealership agreement with Joe's Chevy over at the corner of the street there, the issue would be whether Joe's Chevy could continue to use the General Motors Chevrolet trademark... Correct. ...while it's not even selling Chevrolet cars. That's correct, Your Honor. I think that's right. I think that's exactly what 365N is designed to protect against. And you would say the common law provides exactly that same protection? Yes. Okay. So we're left, at least I'm left, Your Honor, wondering why we're here, although it is certainly an honor to be before you for the first time. But the BAP gave the appellant the relief it needs. It reversed in part and allowed him to go back to the bankruptcy court and presume whatever rights he believes weren't vaporized by the rejection of the agreement. So are you suggesting there's no real difference between what Judge Deasy did and what the BAP did? Because I certainly think there's a difference. I don't disagree. I think there's a difference. I think that the BAP clearly reversed in part that component of Judge Deasy's order that appeared to trample on the post-rejection rights of the appellant under the agreement. But that result has been achieved through appeal for the BAP. That issue shouldn't be before the court, and I don't believe it is before the court. As sort of understood by your questions, what are we supposed to do? No one below you has determined what your rights are. That issue isn't before this court on appeal. Judge Deasy seemed to suggest that with the rejection of the contract, basically nothing survived as to that provision of the contract. The BAP seems to suggest, no, something does survive, and we'll deal with that in the future. Is that fair? I think that's fair, Your Honor, and I think that that's a reasonable and supported interpretation of 365. So we still have to decide the issue of whether something survives or not? I believe the judges in the Bankers and Appellate Panel said something survives. They reversed Judge Deasy on that issue. Unfortunately for all of us, the BAP didn't say what survives. It just says something survives. The rights that mission retains under the agreement weren't vaporized, and so it reversed, in part, with respect to that specific issue, the broader effect of 365. Look, it's clear there's a damages claim. Sure. Rejection gives rise to a breach of contract claim and a damages claim, and then it's incumbent upon the claimant to prove those damages. And you don't read Judge Deasy as saying there was no damages claim that survives? I don't think any bankruptcy judge would take the bench and say that rejection doesn't give rise to a damages claim. It's black-letter law. So, again, what is the difference that you see between the two orders? If Deasy implicitly is saying, yes, there is a damages remedy? I think that's an excellent question, Your Honor. I've been puzzled with that for months. The issue that was presented to us on appeal was this somewhat esoteric interpretation of 365N, and the scope of 365N, and does it apply to trademarks, and does an exclusive distribution right give rise to a protection under 365N because there's some limited non-exclusive license attached to that exclusive distribution right? We say there isn't. We say that that shouldn't have impacted our sale, shouldn't have affected the validity of that sale. And all of this, again, is in the context of a bankruptcy sale that is undertaken to support one of the fundamental precepts of the Bankruptcy Code, which is to maximize value for the benefit of all constituents. And this has thrown that sale into some uncertainty 21 months after the fact. Thank you. Thank you. Thank you. I'll be very brief. To some degree, the discussion of trademarks is the tail wagging the dog in this case. We had, nobody can test, a worldwide, fully paid, non-exclusive license to exploit not only the trademarks, but the patents and technology that CoolCor had developed. We exploited that by selling products containing this technology. Sometimes with their mark and their logo, sometimes not. Our exclusive distribution rights were tied to and dependent upon that non-exclusive global license. And in fact, that license became exclusive inside the territory. Because inside the territory, the debtor could not license that ability to exploit their patents to anyone else, and the debtor could not itself exploit those patents by selling the material. Couldn't they sell things other than cooling accessories? They could sell products that were outside the scope of the license. So it wasn't an exclusive right to the patent, even within the territory? As to the so-called defined products, it was completely exclusive. As to products that were not within the license, they could. But as to those products, no, they were absolutely barred. That was only because there was a limitation with respect to the products, not because there was some footnote on the patent license that made it exclusive within the territory. No, but that's absolutely typical of exclusive licenses. They can be refined as to products, they can be refined as to territories, but it doesn't make them non-exclusive. The very definition of an exclusive license is a non-exclusive license where the licensor can no longer exploit the patents for itself, and where it can't license them. As to the products and as to the territory, both of those things were true. What Judge Deasy's decision took away was our exclusive right to exploit that technology as to those products and in that territory. There's no difference between the, quote, mere right to sell and the use of the intellectual property. Those aren't different things. The only thing we got with this license was the ability to monetize that technology. And if you're going to say that the ability to monetize the technology is not a protectable right, then 365N is a dead letter. Fortunately for us, even if it's a dead letter, the Seventh Circuit's decision gives us all of our rights anyway, and we think that ought to be the law in the First Circuit and elsewhere. Okay, so deal with the Chevrolet dealership hypothetical. Sure. Under Sunbeam's analysis, if, for example, on expiration of the contract, the dealer, as it often does, has the ability to continue to use the marks and operate as a Chevrolet dealer for a period of time, under the Sunbeam analysis they would continue to do that. In fact, post GM, that's in fact what happened in large case with franchisees. They got to continue to actually display marks for a time because those were their contractual rights, and then eventually they had to take them down. Well, suppose it was ten years that they had a right to use the trademark. Then they'd have the right for ten years under the Sunbeam analysis. And GM would have no obligation to supervise the source and quality of the goods? The whole purpose of the trademark is to tell the consumers something about where the goods come from. Sure, and GM would not have to sell them cars. They wouldn't have to sell the cars. It could sell UGOs as Chevrolets. It couldn't sell them as Chevrolets because that would violate, unquestionably violate the terms of the contract. But they could continue to sell Chevrolets if they could get them through some other means. Are you, I'm sorry, this is sort of simplistic economics, but even though the dealer can't sell Chevys anymore, people will be drawn into the dealership by the fact that the sign continues to say Chevy, and that's the value to the dealership of continuing to use the mark? Yeah, that is. So as to your client, what would be the equivalent? Well, in this case it went to whether or not we were the only ones who continued. Remember, we didn't have to buy a product from Mission. And under the arbitration award, we didn't have to source product with Mission at all. We could manufacture our own product using their technology. What we were deprived of by Judge Deasy's decision was the ability for the remainder of the wind-down period to exclusively sell these products within our exclusive market and to make profits from those sales. I mean, if you... But they had some obligations prior to termination to police the use of the trademark, or they could lose the use of the trademark. Correct, and under... And did they not, post-projection, have that obligation? No, they... So what can you have two people using the same trademark if there's no obligation running between them as to policing of the trademark? No, they couldn't violate our exclusivity provision, Your Honor, and that's the distinction between passive and affirmative obligations. What 365N does not allow, and even what Sunbeam doesn't allow, right, is for us to force them to spend money to sell stuff to us, right, or even to take affirmative steps to protect the mark. No, no, but you say you could use the trademark. Sure. And if they tried to use it, I could sue them and stop them, even notwithstanding the bankruptcy. Well, no, they could use it outside. They could use it to the extent the contract always allowed them to use it, yes. Because you didn't have an exclusive right to the trademark. They could not, under our contract rights, use the trademark to sell our products inside our territory. But that's not what my question was. They had a right to use the trademark on lots of stuff. Sure, and as long as it didn't violate our agreement, they could keep doing that post-bankruptcy and post-rebranch. And you want to say that you could use the trademark after the period of time when they had no obligation or even ability to police the quality of the goods that are being sold under the trademark. We could use the trademark for the entirety of the wind-down period, Your Honor. So then you've severed the use of the trademark from the obligations of the trademark owner that provides some assurance to the trademark-facing public that they're getting what they think they're getting, which is something that traces back to the trademark owner. Right. You cannot get specific performance against the debtor to make them do things they were required to do under the agreement. It doesn't mean they can't continue to do them, right? So if their protection of the trademark was good for a business, they could certainly do that. They're not barred from doing it. But what obligation would you have post-rejection to comply with their policing? We have an obligation to comply with the contract to the extent that the contract keeps us from misusing the mark. We can't misuse the mark. We can't disparage the mark. We can't do anything. What we get is the ability to live by our contract with one exception. We can't get specific performance of the debtor's affirmative obligations. We can stop them from interfering with ours. That's not barred. But we can't make them spend money and we can't make them perform. Thank you. Thank you, Your Honor. Thank you.